## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

TRUSTEES OF THE IRON WORKERS'
LOCALS 15 AND 424 PENSION FUND;
TRUSTEES OF THE IRON WORKERS'
LOCALS 15 AND 424 ANNUITY FUND;
TRUSTEES OF THE IRON WORKERS'
LOCALS 15 AND 424 EXTENDED
BENEFIT FUND; TRUSTEES OF THE
IRON WORKERS' LOCALS 15 AND 424
APPRENTICE TRAINING FUND; IRON          No. 3:18-cv-00157 (VAB)
WORKERS' LOCAL 15; IRON
WORKERS' LOCAL 424,
          *Plaintiffs*,

          v.

LIBERTY MUTUAL INSURANCE
COMPANY
          *Defendant.*

## RULING AND ORDER ON MOTION FOR SUMMARY JUDGMENT

Trustees of the Iron Workers' Locals 15 and 424 Pension Fund, Trustees of the Iron

Workers' Locals 15 and 424 Annuity Fund, Trustees of the Iron Workers' Locals 15 and 424

Extended Benefit Fund, Trustees of the Iron Workers' Locals 15 and 424 Apprentice Training

Fund (collectively, "Iron Workers' Locals 15 and 424 Funds"), Iron Workers' Local 15, and Iron

Workers' Local 424 (collectively, "Iron Workers' Locals 15 and 424") (together with Iron

Workers' Locals 15 and 424 Funds, "Plaintiffs"), have sued Liberty Mutual Insurance Company

("Liberty Mutual" or "Defendant"). Plaintiffs claim that Defendant owes them $407,441.64[1] for

labor performed on a building project in 2015–2016.

---

[1] Plaintiffs originally moved for damages in the amount of $409,879.58. *See* Compl. at 4, ECF No. 1 (Jan. 26, 2018).
In their motion for summary judgment, however, Plaintiffs seek only $407,441.64. Pls.' Mem. of Law in Supp. of
Mot. for Summ. J. at 4, ECF No. 25-1 (Sept. 27, 2019) ("Pls.' Mem.").

Plaintiffs have moved for summary judgment. Liberty Mutual has not responded.

For the following reasons, Plaintiffs' motion for summary judgment is **DENIED** without prejudice to renewal by **October 2, 2020**, to the extent Plaintiffs can provide sufficient documentary evidence of the existence of a direct written contract between Iron Workers' Locals No. 15 and 424 and J.L. Marshall & Sons, Inc., or J.F.C. Construction, LLC, for the labor performed on the relevant building project in 2015–2016, consistent with this opinion. If Plaintiffs fail to renew this motion by **October 2, 2020**, or seek leave for an extension of this deadline, the case will be scheduled for trial on this issue only.

As discussed further below, based on Plaintiffs' filings and Liberty Mutual's failure to respond to them, there is no other genuine issue of material fact to be tried, and all of Liberty Mutual's affirmative defenses fail as a matter of law, save one, which fails for lack of record evidence.[2]

Accordingly, consistent with this Court's "inherent authority to manage [its] docket[ ] and courtroom[ ] with a view toward the efficient and expedient resolution of cases," *Dietz v. Bouldin*, 136 S.Ct. 1885, 1892 (2016), rather than simply deny this motion, the Court considers it more expeditious to give Plaintiffs an opportunity to re-file it, if sufficient documentary evidence can be provided, consistent with this opinion.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background

The Contracts

On June 29, 1995, Iron Workers' Locals 15 and 424 entered into a collective bargaining agreement with J.F.C. Construction, LLC ("JFC Construction"), wherein JFC Construction

---

[2] As explained below, Defendant's affirmative defense that payments were made in full to Plaintiffs fails due to lack of record evidence that any such payments were made.

agreed that, as "undersigned Employer," it "shall participate in and pay contributions to the Iron Workers Locals No. 15 and 424 Extended Benefit, Pension, Annuity, and Apprentice Training Funds and in accordance with the terms and conditions of the Agreement entered into by and between" several entities, consisting of "the Labor Relations Division, The Associated General Contractors of Connecticut, Inc., a division of CCIA[;] the Connecticut Iron Workers Employer Association[;] and Locals No. 15 and 424, Connecticut, of the International Association of Bridge, Structural and Ornamental Iron Workers, AFL-CIO." Pls.' Ex. B, ECF No. 25-4 (Agreement Signature Page (June 29, 1995)) ("1995 Collective Bargaining Agreement Signature Page"); *see also* Local Rule 56(a)1 Statement ¶ 3, ECF No. 25-2 (Sept. 27, 2019) ("Pls.' SOMF"); Pls.' Ex. K ¶ 3, ECF No. 25-14 ("Henderson Aff."). Plaintiffs have not submitted the contents of the 1995 agreement.

On August 14, 2014, Iron Workers' Locals 15 and 424 entered into a collective bargaining agreement stating that the "undersigned Employer shall participate in and pay contributions to the Iron Workers Locals No. 15 and 424 Extended Benefit, Pension, Supplemental Pension, Annuity, and Apprenticeship and Training Funds and in accordance with the terms and conditions of the Agreement entered into by and between" several entities, again consisting of "AGC/CCIA Building Contractors Labor Division, Inc.[;] Connecticut Iron Workers Employers Association[;] and Locals No. 15 and 424 Connecticut, of the International Association of Bridge, Structural, Ornamental and Reinforcing Ironworkers, AFL-CIO." Pls.' Ex. A, ECF No. 25-3 (Agreement (Aug. 13, 2014)) ("2014–2018 Collective Bargaining Agreement"); *see also* Pls.' SOMF ¶ 3. The Agreement covered the period from June 30, 2014, through June 29, 2018. 2014–2018 Collective Bargaining Agreement.

On August 22, 2014, the Greater Hartford-New Britain Building and Construction Trades

Council, which represents Building and Construction Trades Unions, entered into a labor

agreement with Skanska U.S.A. Building, Inc. ("Skanska"), Construction Manager, for

construction on the University of Connecticut Innovation Partnership Building Project ("the

UConn Project"). Pls.' Ex. C at 4, ECF No. 25-5 (Project Labor Agreement (Aug. 22, 2014))

("Project Labor Agreement"). Under the Agreement, the parties agreed "that the Project work

covered by this Agreement shall be contracted only to Contractors," including subcontractors,

"that agree to execute and be bound by the terms of this Agreement[.]" *Id.* at 5.

On June 23, 2015, Skanska entered into an agreement with J.L. Marshall & Sons, Inc.

("JL Marshall") for construction on the UConn Project. *See* Pls.' Ex. G, ECF No. 25-10

(Payment Bond (Aug. 10, 2015)) ("Payment Bond").

On August 10, 2015, JL Marshall, as Principal, and Liberty Mutual, as Surety, entered

into a Payment Bond agreement with Skanska, as Obligee, in the amount of $9,770,445.00, for

the UConn Project. Payment Bond; Pls.' SOMF ¶ 2; Pls.' Ex. L at 7, ECF No. 25-15 (Liberty

Mutual Ins. Co.'s Objs. and Resps. to Pls.' Interrogs., Reqs. for Produc., and Reqs. for Admis.

(June 25, 2019)) ("Def's. Resp. to Interrogs. and Reqs.").

The UConn Project and Payments to Ironworkers' Locals 15 and 424

JL Marshall subcontracted with JFC Construction to complete the UConn Project. *See*

Pls.' SOMF ¶ 2; Henderson Aff. ¶ 5. The Payment Bond among JL Marshall, Liberty Mutual,

and Skanska was in effect for the time period that JFC Construction was working on the UConn

Project. Def's. Resp. to Interrogs. and Reqs. at 7.

JFC Construction worked with the Iron Workers' Locals 15 and 424 on multiple projects,

including the UConn Project. Susan Henderson, Executive Director of the Iron Workers' Locals

15 and 424 Funds, states in her affidavit that, before "the delinquency at issue" with the UConn

Project, JFC Construction "was delinquent for all projects worked through October 2015."

Henderson Aff. ¶ 8. On October 15, 2015, counsel for the Iron Workers' Locals 15 and 424

Benefit Funds[3] sent a letter to JL Marshall stating that JFC Construction was "delinquent in its

monthly contributions to the funds" for the weeks of July 18, 2015, through October 3, 2015, and

inquiring as to "whether [JL Marshall was] amenable to a joint check agreement" in order to

resolve the situation and ensure that "the union members receive the contributions they are

entitled to from JFC Construction for the work performed on your Company's behalf." Pls.' Ex.

H, ECF No. 25-11 (Letter from Brendan Hughes to Robert Niles (Oct. 15, 2015)) ("October 15,

2015 Letter to JL Marshall").

On October 26, 2015, however, counsel for the Iron Workers' Locals 15 and 424 Benefit

Funds sent a letter to JL Marshall stating that "the Funds ha[d] reached a resolution regarding

JFC Construction's benefit obligations at this time" and that they were therefore "no longer

seeking joint check payments for benefits on your project." Pls.' Ex. I, ECF No. 25-12 (Letter

from Brendan Hughes to Robert Niles (Oct. 26, 2015)) ("October 26, 2015 Letter to JL

Marshall"). Counsel further instructed JL Marshall that "[w]hen payments become due to JFC"

Construction from JL Marshall, it should "please issue all such payments directly to" JFC

Construction, rather than issuing joint check payments directly to the Funds. *Id.* JFC

Construction "subsequently remitted payment to cure the previous delinquency and paid benefits

owed across all projects through [the] week ending [on] November 7, 2015." Henderson Aff. ¶ 8;

*see also* Pls.' SOMF ¶ 8.

---

[3] The October 15, 2015 Letter to JL Marshall states that counsel represented the "Trust Funds," and the October 26, 2015 states that counsel represented the "Benefit Funds," but it appears these letters are referring to the same benefit funds and the same alleged delinquency of JFC Construction during the summer of 2015. *See* October 26, 2015, Letter to JL Marshall ("This correspondence follows my previous letter to your company dated October 15, 2015.").

During the week ending on November 7, 2015, as stated under oath by Ms. Henderson, JFC Construction began reporting on work performed on individual projects, including the UConn Project as well as others for which JFC was subcontractor. Henderson Aff. ¶ 9. "JFC [Construction] reported work on large projects as a subcontractor of C.H. Nickerson, Inc. (hereinafter 'Nickerson'), O&G Industries, Inc. (hereinafter 'O&G'), and [JL Marshall]." *Id.*

From November 21, 2015, through July 23, 2016, JFC Construction performed work on the UConn Project, during which time JFC employed ironworkers. Pls.' SOMF ¶ 5; Pls.' Ex. D, ECF No. 25-6 (Conn. Dep't of Labour Wage & Workplace Standards Divs., Payroll Certification for Public Works Projects Weekly Payroll as required by Conn. Gen. Stat. § 21-53 (Nov. 21, 2015–July 23, 2016)) ("Weekly Payroll Records"). Payroll records reflect that, between the week ending on November 21, 2015, and the week ending on February 27, 2015, eleven to twenty ironworker journeymen, foremen, and apprentices were paid during a given week for their work on the UConn Project. Weekly Payroll Records at 1–65.

Between the week ending on March 5, 2016, and the week ending on July 23, 2016, one to eleven ironworker journeymen, foremen, and apprentices were paid during a given week for their work on the Project. *Id.* at 89–130, 133–55. Each week's weekly payroll certification was accompanied by a Certified Statement of Compliance, as required by Conn. Gen. Stat. § 31-53, signed by a manager at JFC Construction and certified that, for each weekly payroll, benefits had been paid into the Iron Workers' Locals 15 and 424 Benefit Package and their pension plan. *Id.* at 1–65, 89–130, 133–55.

"[F]rom November 14, 2015 onward," JFC Construction "submitted remittance reports to the [Iron Workers' Locals' Funds] identifying the Ironworkers and the hours worked by Ironworkers" for all projects, including the UConn Project. Compl. ¶ 7. Some reports were

6

ultimately paid, *see* Pls.' Ex. E pt. 2, ECF No. 25-8 (Remittance Reports Paid All Projects Week Ending November 14, 2015 Forward) ("Paid Remittance Reports—All Projects"); and some were not paid, *see* Pls.' Ex. E pt. 1 at 1–49, ECF No. 25-7 (Remittance Reports Unpaid UConn IPB Project (Nov. 21, 2015–July 23, 2016)) ("Unpaid Remittance Reports—UConn Project"); Pls.' Ex. E pt. 1 at 50–63, ECF No. 25-7 (Remittance Reports Unpaid All Other Projects (Oct. 22, 2016–Aug. 12, 2017)) ("Unpaid Remittance Reports—All Other Projects"). Every remittance report reflects that JFC weekly owed contributions to the Iron Workers' Locals 15 and 424 Pension Fund, Extended Benefit Fund, Apprentice Training Fund, and Annuity Fund, in amounts based on hourly rates per worker. *See* Paid Remittance Reports—All Projects; Unpaid Remittance Reports—UConn Project; Unpaid Remittance Reports—All Other Projects.

JFC Construction paid some of what it owed on these projects by direct payment to the Iron Workers' Locals 15 and 424 Funds, and some by joint check with the relevant general contractor for the respective projects. Pls.' SOMF ¶ 9 (specifying amounts paid by JFC Construction directly or jointly with other entities); Pls.' Ex. F, ECF No. 25-9 (Checks to and from JFC (Feb. 23, 2016–June 7, 2018)) ("JFC Checks"); Henderson Aff. ¶¶ 9–10.

According to Ms. Henderson, JFC Constructions' payments included the following:

- **$512,909.72** paid by joint or direct checks to the Funds from O&G Industries,

- **$578,841.01** paid by joint or direct check to the Funds from Nickerson,

- **$143,662.51** paid directly by JFC Construction, and

- **$13,905.10** paid by JFC Construction "for interest associated with late payments for weeks prior to [the] week ending November 14, 2015."

Henderson Aff. ¶ 10. Ms. Henderson stated that "[a]ll joint check or direct check payments were applied to the projects for which JFC performed work for the respective contractor." *Id.* "Of the

*$146,809.17*[4] paid directly by JFC [Construction]," she said, "*$22,937.92* was applied to the [UConn] Project[,] reducing the total amount owed from weeks ending November 14, 2015[,] through July 23, 2016[,] from *$430,379.56* to *$407,441.64*." *Id.* ¶ 11 (emphasis in the original).

Ms. Henderson states that benefits owed by JFC Construction were calculated by multiplying the total hours worked each week by the total benefit rate, or the "sum of all Fringe Benefit Funds rates in the Collective Bargaining Agreement for the respective time periods." *Id.* ¶ 12. The total benefit rate was **$31.59** per hour for hours worked between July 1, 2015, and June 30, 2016; and **$32.39** per hour for hours worked between July 1, 2016, and June 30, 2017. *Id.* Additional contributions for "hours paid but not worked including paid time off, holiday pay, and overtime premium pay" were required under the Collective Bargaining Agreement, and were calculated at an "hours paid" benefit rate of **$8.11** for all such hours between July 1, 2015, and June 30, 2016; and **$9.50** for all such hours between July 1, 2016, and June 30, 2017. *Id.* According to Ms. Henderson, "[t]hese weekly totals were added in a summary chart to reach the total damages amount of *$407,441.64* for weeks ending November 21, 2015[,] through July 23, 2016." *Id.* (emphasis in the original); *see* Unpaid Remittance Reports—UConn Project at 2 (Summary Chart).

On January 11, 2017, counsel for the Trustees of the Iron Workers' Locals 15 and 424 Benefit Funds sent a letter to the Bond Claim Department at Fidelity and Deposit Company of Maryland & Zurich American Insurance Company ("Fidelity"). Pls.' Ex. J, ECF No. 25-13 (Letter from Brendan Hughes to Fidelity Bond Claim Department (Jan. 11, 2017)) ("January 11, 2017 Bond Claim Letter"). The letter stated that Fidelity was "the surety on a bond in which

---

[4] It is unclear how the figure $146,809.17, quoted from Ms. Henderson's affidavit, is calculated, since the amounts that JFC Construction paid directly, again according to Ms. Henderson, are $143,662.51 and $13,905.10, which combine for a total of $157,567.61.

Skanska [ ] [wa]s named as principal," that Skanska contracted work to JFC Construction on the UConn Project, and that "members of Iron Workers' Locals 15 and 424 ha[d] supplied labor on the [UConn Project] for which they ha[d] not been fully compensated." *Id.* The letter asserted that JFC Construction owed the Iron Workers' Locals 15 and 424 Pension, Extended Benefit, Annuity, and Apprentice Training Funds $415,726.26 in benefit contributions that it had not contributed for "work performed at the request of Skanska on" the UConn Project. *Id.* The letter demanded "payment on the bond" from Fidelity "in the amount of $415,726.26 for the balance of contributions owed . . . ." *Id.*

Plaintiffs have unsuccessfully attempted to collect payment from JFC Construction directly, and it is Ms. Henderson's understanding that JFC Construction has now "dissolved and presently has no assets from which to collect." *Id.* ¶¶ 13–14.

### B. Procedural History

On January 26, 2018, Plaintiffs filed their Complaint, alleging that because "Liberty Mutual, as surety, entered into [the] Payment Bond with J.L. Marshall as principal, conditioned on payment by J.L. Marshall for all labor and materials used or employed in the performance of all subcontracts in connection with the [UConn] Project," and JFC Construction "performed work on the [UConn] Project pursuant to a subcontract," Liberty Mutual is obligated to pay "all benefit contributions due to the Funds and the Union arising . . . under the [Payment] Bond . . . ." Compl., ECF No. 1 ¶¶ 16–18 (Jan. 26, 2018).

On April 16, 2018, Liberty Mutual filed its Answer to the Complaint and raised affirmative defenses. Answer, ECF No. 9 (Apr. 16, 2018).

On September 27, 2019, after discovery, Plaintiffs moved for summary judgment against Liberty Mutual. Mot. for Summ. J., ECF No. 25 (Sept. 27, 2019) ("Pls.' Mot."). In support of

their motion, Plaintiffs filed a memorandum of law and a statement of material facts. Mem. of Law in Supp. of Mot. for Summ. J., ECF No. 25-1 (Sept. 27, 2019) ("Pls.' Mem."); Pls.' SOMF. Plaintiffs also submitted twelve exhibits. Pls.' Exs., ECF Nos. 25-3—25-15 (Sept. 27, 2019).

Liberty Mutual has not responded to Plaintiffs' motion for summary judgment.

On July 8, 2020, the Court entered a notice on the docket stating: "The Court intends to address the pending motion for summary judgment in the coming weeks without oral argument. As no responsive papers have been filed by the relevant deadline, the Court will not accept any further briefing." Notice, ECF No. 26 (July 8, 2020).

## II.   STANDARD OF REVIEW

A court will grant a motion for summary judgment if the record shows no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient evidence to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48 (emphasis in the original).

"[T]he substantive law will identify which facts are material." *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*; *see Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("[M]ateriality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." (citing *Anderson*, 477 U.S. at 248)).

"The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the non-moving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted).

The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250 (citing *Dombrowski v. Eastland*, 387 U.S. 82, 87 (1967); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).

A court must view any inferences drawn from the facts in the light most favorable to the party opposing the summary judgment motion. *See Dufort v. City of N.Y.*, 874 F.3d 338, 343 (2d Cir. 2017) ("On a motion for summary judgment, the court must 'resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'"). A court will not draw an inference of a genuine dispute of material fact from conclusory allegations or denials, *see Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011), and will grant summary judgment only "if, under the governing law, there can be but one reasonable conclusion as to the verdict," *Anderson*, 477 U.S. at 250.

"The non-moving party need not respond to the motion" for summary judgment; "[h]owever, a non-response runs the risk of unresponded-to statements of undisputed facts [proffered] by the movant being deemed admitted." *Jackson v. Fed. Exp.*, 766 F.3d 189, 194 (2d Cir. 2014) (citing Fed. R. Civ. P. 56(e)(2); *Jones v. Lamont,* No. 05 Civ. 8126, 2008 WL 2152130, at *1 (S.D.N.Y.2008) ("In view of [pro se ] plaintiff's failure to respond to the motion, the well supported factual allegations set forth in defendants' Rule 56.1 statement are deemed admitted."), *aff'd*, 379 F. App'x 58 (2d Cir. 2010).

The Second Circuit has held, however, that Federal Rule of Civil Procedure 56 "does not embrace default judgment principles. Even when a motion for summary judgment is unopposed, the district court is not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 242 (2d Cir. 2004). "[F]ailure to oppose a motion for summary judgment alone does not justify the granting of summary judgment. Instead, the district court must still assess whether the moving party has fulfilled its burden of demonstrating that there is no genuine issue of material fact and its entitlement to judgment as a matter of law." *Id.* at 244.

"[I]f a non-moving party fails to oppose a summary judgment motion, then 'summary judgment, if appropriate*, shall be entered against' him. *Vt. Teddy Bear Co.*, 373 F.3d at 244 (quoting Fed. R. Civ. P. 56(e)). But "the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial." *Amaker v. Foley*, 274 F.3d 677, 681 (2d Cir.2001). "[T]he court may [also] rely on other evidence in the record even if uncited." *Jackson*, 766 F.3d at 194 (citing Fed. R. Civ. P. 56(c)(3)). "If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then 'summary

judgment must be denied *even if no opposing evidentiary matter is presented.*'" *Vt. Teddy Bear Co.*, 373 F.3d at 244 (citation in the original) (quoting *Amaker*, 274 F.3d at 681); *see also Giannullo v. City of N.Y.*, 322 F.3d 139, 141 (2d Cir. 2003) (noting that the "non-movant is not required to rebut an insufficient showing").

> Moreover, in determining whether the moving party has met this burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 statement. It must be satisfied that the citation to evidence in the record supports the assertion.

*Vt. Teddy Bear Co.*, 373 F.3d at 244 (citing *Giannullo,* 322 F.3d at 143 n.5 (stating that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts")).

Additionally, "[a]n unopposed summary judgment motion may fail where the undisputed facts fail to show that the moving party is entitled to judgment as a matter of law." *Vt. Teddy Bear Co.*, 373 F.3d at 244 (quoting *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir. 1996) (internal quotation marks and citations omitted)).

## III.   DISCUSSION[5]

Plaintiffs claim that Liberty Mutual owes them under the Payment Bond for JFC Construction's unpaid contributions to Iron Workers' Local 15 and 424 Funds. Compl. ¶¶ 16–18.

Although Liberty Mutual did not respond to the motion for summary judgment, it asserted seventeen affirmative defenses in its Answer. *See* Answer at 3–5. Liberty Mutual stated

---

[5] The Court notes that it has diversity jurisdiction over this case under 28 U.S.C. § 1332. Complete diversity exists, as Plaintiffs are located in Connecticut, Compl. ¶¶ 1–4, and Defendant is "organized and existing under the laws of the State of Massachusetts with a principal place of business in the State of Massachusetts," Defs.' Resp. to Interrogs. and Reqs. at 7; and the amount in controversy exceeds $75,000.00, Compl. at 4.

further that, "[t]o the extent Defendant has any liability . . . , it is limited to the penal sum of the

bond at issue in this case." *Id.* at 5.

### A. Plaintiffs' Authority to Collect Under the Payment Bond

Plaintiffs—Iron Workers' Locals 15 and 424, unions; and Iron Workers' Locals 15 and

424 Funds, employee benefit funds for the unions—contend that because (1) they "had a direct

written contract with a subcontractor of J.L. Marshall, [(2)] employees of JFC [Construction]

provided labor on the [UConn] Project for which benefit contributions were owed to Plaintiffs,

and [(3)] Plaintiffs were not paid prior to the expiration of 90 days from the last work being

performed on the Project, they are proper claimants as defined in the" Payment Bond. Pls.' Mem.

at 12–13.[6]

"A suretyship is a three-party relationship where the surety . . . undertakes to perform to

an obligee . . . if the principal . . . fails to do so." *Elm Haven Const. Ltd. P'ship v. Neri Const.,*

*LLC*, 281 F. Supp. 2d 406, 412 (D. Conn. 2003) (internal citation omitted), *aff'd*, 376 F.3d 96 (2d

Cir. 2004) "The general purpose of a suretyship contract is to guard against loss in the event of

---

[6]      Plaintiffs argue that the Payment Bond language "defining eligible claimants is no more restrictive than the
language of the Miller Act and the Connecticut Little Miller Act," under which "Employee Benefit Funds are proper
claimants with standing to bring claims on behalf of employees performing work on construction projects." Pls.'
Mem. at 12 (citing *Conn. Carpenters Benefit Funds v. Burkhard Hotel Partners II, LLC*, 83 Conn. App. 352, 357
(2004); *Bleiler v. Cristwood Const., Inc.*, 72 F.3d 13, 16 (2d Cir. 1995); *U.S. for Benefit & on Behalf of Sherman v.
Carter*, 353 U.S. 210, 220 (1957)).

        Under Connecticut General Statutes §§ 49–41 through 49–43, popularly known as the "Little Miller Act"
because it was patterned after the federal Miller Act, 40 U.S.C. § 3131 *et seq.*, "a general contractor on a public
works construction project must provide a payment bond with surety to the state or governmental subdivision
guaranteeing payment to those who supply labor and materials to the project, and any person who has performed
work or supplied materials for the project, but has not been paid for such materials or work, may enforce his right to
payment under the payment bond." *Elec. Contractors, Inc. v. Ins. Co. of State*, 314 Conn. 749, 750–51 (2014).

        The payment bond at issue here is a private bond, not subject to the Little Miller Act, as it was not issued to
a state or governmental subdivision. *See U.S. ex rel. Polied Envtl. Servs., Inc. v. Incor Grp., Inc.*, No. 3:02-cv-01254
(GLG), 2003 WL 1797846, at *2 (D. Conn. Apr. 4, 2003) (plaintiff did not have claim under the federal Miller Act
because "the bond furnished by [the insurance company defendant] was clearly a private payment bond . . . listing
Incor as the contractor and USA, Inc., as the owner," and it was not given to the United States, as required by 40
U.S.C. § 270a(a)(1)."). The Little Miller Act thus does not govern here.

the principal debtor's default. The obligation of a surety is an additional assurance to the one entitled to the performance of an act that the act will be performed. The liability of sureties is to be determined by the specified conditions of the bond." *Id.* (quoting *Ames v. Comm'r of Motor Vehicles*, 70 Conn. App. 790, 797 (2002) (internal quotation marks and alterations omitted)).

Under the terms of this Payment Bond, "J.L. Marshall [ ], as Principal, and Liberty Mutual [ ], as Surety, are bound unto Skanska [ ], as Obligee, in the penal sum of [$9,770,445]," for work on the UConn Project. Payment Bond. The Payment Bond provides that "[J.L. Marshall] and [Liberty Mutual] jointly and severally agree with [Skanska] that every claimant as herein defined, who has not been paid in full before the expiration of ninety (90) days after the date on which the last of such claimant's work or labor was done or performed . . . may sue on this bond for the use of such claimant," provided that the claimant bring an action "within one (1) year of the date on which the Principal ceased work on said Agreement." *Id.*

The Payment Bond defines a claimant as "one having a direct written contract with the Principal or with a Subcontractor of the Principal for labor, material, or both, used or reasonably required for use in the performance of the Agreement." *Id.*

In order for Plaintiffs to qualify as a claimant, they therefore must have a direct written contract with JL Marshall or with a subcontractor of JL Marshall for labor or material used, or reasonably required for use, in the UConn Project.

There is no genuine issue of material fact as to Plaintiff's assertions that members of Iron Workers' Locals No. 15 and 424 provided labor to JFC Construction, a subcontractor of JL Marshall, for the UConn Project. *See* Weekly Payroll Records.

But a genuine issue of material fact does exist as to whether there was a direct written

contract between Iron Workers' Locals No. 15 and 424 and JFC Construction, or JL Marshall,

which would permit Plaintiffs to sue as claimants on the Payment Bond.

There are four contractual documents in the record:

(1) The Payment Bond, in which JL Marshall and Liberty Mutual agree, with Skanska, that anyone who has a direct written contract with JL Marshall, or a subcontractor of JL Marshall, may sue on the Payment Bond for payment for "labor, material, or both, used or reasonably required for use in the" UConn Project;

(2) The Project Labor Agreement, in which Skanska agrees with the Greater Hartford-New Britain Building and Construction Trades Council that UConn Project work "shall be contracted only to Contractors," including subcontractors, "that agree to execute and be bound by the terms of this Agreement[;]"

(3) The 2014–2018 Collective Bargaining Agreement, in which three entities agree that the "undersigned Employer shall participate in and pay contributions to the Iron Workers Locals No. 15 and 424 Extended Benefit, Pension, Supplemental Pension, Annuity, and Apprenticeship and Training Funds and in accordance with the terms and conditions of the Agreement entered into by and between" these entities:

   a. The AGC/CCIA Building Contractors Labor Division, Inc.;
   b. The Connecticut Iron Workers Employers Association, "acting for and in behalf of firms it is authorized and agrees to represent during the term of this Agreement, hereinafter referred to as the 'Employers' (see Addendum I)," ECF No. 25-3 at 5; and
   c. Iron Workers Locals No. 15 and 424;

(4) The 1995 Collective Bargaining Agreement Signature Page, in which four entities agree that the "undersigned Employer shall participate in and pay contributions to the Iron Workers Locals No. 15 and 424 Extended Benefit, Pension, Annuity, and Apprentice Training Funds and in accordance with the terms and conditions of the Agreement entered into by and between" these four entities:

   a. The Labor Relations Division, Associated General Contractors of Connecticut,
   b. The Connecticut Iron Workers Employer Association,
   c. Iron Workers Locals No. 15 and 424, and
   d. JFC Construction.

Thus, the only direct written contract between Iron Workers Locals No. 15 and 424 and

JFC Construction is the 1995 Collective Bargaining Agreement Signature Page.

Plaintiffs contend that because "JFC [Construction] never repudiated its [a]greement to be bound by the [Collective Bargaining Agreement]," JFC Construction is bound by the 2014–2018 Collective Bargaining Agreement. Pl.'s Mem. at 7.

But Plaintiffs have not submitted the complete agreement to which the 1995 Collective Bargaining Agreement Signature Page applies; there is no indication in the 1995 Collective Bargaining Agreement Signature Page that the agreement would last until repudiation, or that the agreement had a set term; and there is no indication in the 2014–2018 Collective Bargaining Agreement that it either supersedes or incorporates any previous collective bargaining agreement. Moreover, although the 2014–2018 Collective Bargaining Agreement reflects that the Connecticut Iron Workers Employer Association entered the agreement on behalf of various employers which appear to be listed in "Addendum 1," *see* ECF No. 25-3 at 5, there is no "Addendum 1" attached to the Agreement in the record, nor any other list of the employers represented by the Connecticut Iron Workers Employer Association. Thus, the 2014-2018 Collective Bargaining Agreement alone does not establish the existence of a direct written contract between Plaintiffs and JFC Construction during the time period of the UConn Project, in order to permit Plaintiffs to bring a claim on the Payment Bond.

As the 1995 Collective Bargaining Agreement Signature Page is not attached to any full agreement, it is not clear for what term, if any, the agreement was in effect. If, as Plaintiffs suggest, the 2014-2018 Collective Bargaining Agreement is not different from the 1995 Collective Bargaining Agreement, the 1995 Agreement should include language also included in the 2014-2018 Agreement. In Plaintiffs' view, however, the 1995 Collective Bargaining Agreement remained in effect, until it was repudiated. Pl.'s Mem. at 7.

This may be true.

17

The 1995 Collective Bargaining Agreement Signature Page appears to constitute a pre-hire agreement under Section 8(f) of the National Labor Relations Act ("NLRA"), codified at 29 U.S.C. § 158(f). "Section 8(f) explicitly permits employers in the construction industry—but no other employers—to enter into prehire agreements." *Bldg. & Const. Trades Council of Metro. Dist. v. Associated Builders & Contractors of Massachusetts/Rhode Island, Inc.*, 507 U.S. 218, 230 (1993). A prehire agreement is "a labor agreement that was entered into before employees were hired and before the union had demonstrated that it represented a majority of the workforce." *Conn. Ironworkers Emp'rs Assoc. v. New England Reg'l Council of Carpenters*, 157 F. Supp. 3d 173, 181 (D. Conn. 2016) (internal citation and quotation marks omitted), *aff'd in part, vacated in part on other grounds sub nom. Conn. Ironworkers Emp'rs Ass'n, Inc. v. New England Reg'l Council of Carpenters*, 869 F.3d 92 (2d Cir. 2017). "[B]ecause general contractors and other employers in the construction industry do not hire and keep employees and subcontractors on the same permanent basis as other employers do, it is necessary for these employers to have more flexibility in their bargaining contracts and union relations." *Baker Concrete Const., Inc. v. Reinforced Concrete Contractors Ass'n*, 820 F.3d 827, 832 (6th Cir. 2016) (citing *Iron Workers Local 3*, 843 F.2d at 772–73); *see also id.* ("To accommodate these unique needs, Congress added § 8(f) to make prehire agreements legal within the construction industry.").

The National Labor Relations Board long has held that "an employer may not repudiate a pre[]hire agreement during the term of the contract." *Benson v. Brower's Moving & Storage, Inc.*, 907 F.2d 310, 315 n.3 (2d Cir. 1990) (citing *John Deklewa & Sons*, 282 N.L.R.B. 1375 (1987), *enforced sub nom. Int'l Ass'n of Bridge, Structural and Ornamental Iron Workers, Local 3 v. NLRB* ("*Iron Workers Local 3*"), 843 F.2d 770 (3d Cir.), *cert. denied*, 488 U.S. 889 (1988)).

18

"At the conclusion of the term of the agreement," however, "both the employer and the union can unilaterally repudiate the § 8(f) bargaining relationship." *Mulvaney Mech., Inc. v. Sheet Metal Workers Int'l Ass'n, Local 38*, 288 F.3d 491, 496 (2d Cir. 2002), *vacated on other grounds*, 538 U.S. 918 (2003). Thus, an agreement remains binding on the parties, even after the expiration of the agreement's term, until a party repudiates the agreement.

While the Court has not identified any Second Circuit precedent on the issue of whether a nonrepudiated pre-hire agreement nonetheless expires after some period of time, the Sixth Circuit has noted that Section 8(f) agreements, "by their very nature, are tentative and anticipatory." *Baker Concrete*, 820 F.3d at 832. The Supreme Court has stated that, "'[a]bsent majority credentials . . . , the collective-bargaining relationship and the union's entitlement to act as the exclusive bargaining agent [ ] never mature[].'" *Jim McNeff, Inc. v. Todd*, 461 U.S. 260, 267 (1983) (quoting *N. L. R. B. v. Local Union No. 103, Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, AFL-CIO*, 434 U.S. 335, 345 (1978) ("[A] prehire agreement is merely a preliminary step that contemplates further action for the development of a full bargaining relationship." (internal citation and quotation marks omitted))). The Sixth Circuit therefore has reasoned that:

> Section 8(f) agreements are intended to cover foreseeable groups of employees for short-term or interim construction projects where they would otherwise be unrepresented. When there have been no employees to represent for at least ten years, and will be no employees to represent in the foreseeable future—as it is undisputedly the case with Baker here—it is difficult to conceive of a reason to deny a contractor the right to terminate an agreement that was intended to be tentative, anticipatory, and conditional in the first place.

*Baker Concrete*, 820 F.3d at 832.

Evidence in the record suggests that JFC Construction hired members of Iron Workers'
Locals No. 15 and 424 for projects in 2015, twenty years after JFC Construction signed the 1995
Collective Bargaining Agreement. Without evidence of the relationship between JFC
Construction and Plaintiffs between 1995 and 2015, however, the 1995 Collective Bargaining
Agreement Signature Page  does not establish the existence of a direct written contract between
Plaintiffs and JFC Construction during the time period of the UConn Project, in order to permit
Plaintiffs to bring a claim on the Payment Bond.

The Project Labor Agreement may constitute another direct written contract which could
permit Plaintiffs to bring a claim under the Payment Bond. This Agreement provides that work
on the UConn project "shall be contracted only to Contractors that agree to execute and be bound
by the terms of this Agreement by signing a Letter of Assent in the form attached hereto as
Exhibit C," except in some special circumstances. Project Labor Agreement at 5. "Contractors"
is defined to "include all Contractors and subcontractors of whatever tier engaged in on-site
construction work within the scope of this Agreement." *Id.*

Plaintiffs include a blank copy of the Letter of Assent, *see* Project Labor Agreement at
53–54, but they have not included a letter of assent signed by JFC Construction. Thus, on this
record, the Project Labor Agreement also does not establish the existence of a direct written
contract between Plaintiffs and JFC Construction during the time period of the UConn Project, in
order to permit Plaintiffs to bring a claim on the Payment Bond.

Accordingly, because there is a genuine issue of material fact as to whether Plaintiffs are
proper claimants to bring a claim under the Payment Bond, the Court cannot grant summary
judgment at this time.

Nevertheless, to clarify matters for further proceedings, the Court will address Plaintiffs'
additional arguments and Defendant's affirmative defenses.

**B.  The Timeliness of Plaintiff's Claims**

The Payment Bond provides that a claimant "who has not been paid in full before the
expiration of ninety (90) days after the date on which the last of such claimant's work or labor
was done or performed . . . may sue on this bond for the use of such claimant," provided that the
claimant bring an action "within one (1) year of the date on which the Principal ceased work on
said Agreement." *Id.*

Plaintiffs filed this action on January 26, 2018. *See* Compl. Thus, in order for a claimant
to bring a claim under the express terms of the Payment Bond, JL Marshall, as Principal, must
not have ceased work on the UConn Project any earlier than January 26, 2017.

Plaintiffs argue that the one-year filing deadline in the Payment Bond is unenforceable,
however, under Conn. Gen. Stat. § 38a-290. Pl.'s Mem. at 11–12.

The Court agrees.

Under Conn. Gen. Stat. § 38a-290, "[n]o insurance company doing business in this state
shall limit the time within which any suit shall be brought against it . . . on (1) a fidelity or surety
bond to a period less than three years from the time when the loss insured against occurs," or
"(2) a construction performance bond to a period less than three years from the date on which the
principal last performed work under the contract[.]" This provision prohibits private bonds from
limiting claims to those brought within less than three years. *Oldcastle Precast, Inc. v. St. Paul
Fire & Marine Ins. Co.*, No. CIVA 3-05-cv-571 (JCH), 2007 WL 2904208, at *3 (D. Conn. Oct.
1, 2007) ("[N]otwithstanding the language of the bond, a sub-subcontractor could bring a claim
against the bond up to three years from the time when the work was finished under Connecticut

law." (citing *Serrano v. Aetna Ins. Co.*, 233 Conn. 437, 459 (1995) (holding that two-year

contractual limitation to bring claim under auto-insurance policy was retroactively invalidated by

statute later recodified as § 38a–290)).

Thus, the one-year filing requirement in the Payment Bond is unenforceable and cannot

preclude proper claimants from bringing suit against Liberty Mutual.

### C. Defendant's Affirmative Defenses

Although Liberty Mutual did not respond to the motion to dismiss, it raised seventeen

affirmative defenses in its Answer:

1. Defendant is entitled to assert all defenses of its bonded principal and does so assert all defenses possessed by its bonded principal.

2. Plaintiffs' claim is barred due to Plaintiffs failure to adhere to ARTICLE X. WAGES AND BENEFITS, SECTION 3. TRUST FUND DELINQUENCIES of the Project Labor Agreement ("PLA").

3. Plaintiffs materially breached the terms of the PLA and as such are barred from bringing claims against Defendant.

4. Plaintiffs' claim is barred because Plaintiffs received full payment for any and all benefits due from work performed on [the UConn Project].

5. Plaintiffs' claim is barred due to the doctrine of unclean hands.

6. Plaintiffs' claim is barred because Plaintiffs expressly and impliedly waived their rights to any alleged deficiencies in payments to benefits funds managed by the Trustees.

7. Plaintiffs' claim is barred by the doctrine of laches.

8. Plaintiffs' claim is barred due to its failure to mitigate its own damages.

9. Plaintiffs' claim is barred because any recovery f[ro]m Defendant would lead to Plaintiffs' unjust enrichment.

10. Plaintiffs' complaint should be dismissed for failure to name and join necessary parties.

11. Any damage, if any, suffered by Plaintiffs is not the result of any action by Defendant, and is the result of others including Plaintiffs and parties Plaintiffs failed to name.

12. Plaintiffs' [C]omplaint should be dismissed because any [and] all actions by Defendant as they concern this matter were lawful.

13. Plaintiffs' claim is barred because Plaintiffs are not in privity of contract with Defendant.

14. Plaintiffs' claim is barred because Plaintiff failed to adhere to the requirements of the bonds provided to J.L. Marshall [ ] by Defendant.

15. Plaintiffs' claim is barred by the doctrine of accord and satisfaction.

16. Plaintiffs' claim is barred by the applicable statute of limitation.

17. Plaintiffs fail to state a claim for which relief can be granted.

Answer at 3–5.

The Court will address each affirmative defense in turn.

**1.  The Right to Assert Defenses of Bonded Principal Defense**

Liberty Mutual's first affirmative defense is that it "is entitled to assert all defenses of its bonded principal and does so assert all defenses possessed by its bonded principal." Answer at 3.

Plaintiffs argue that this affirmative defense is "inoperative as a direct challenge to any of Plaintiffs['] claims" because affirmative defenses must be affirmatively pled. Pl.'s Mem. at 12. In Plaintiffs' view, "except to the extent that this affirmative defense may serve as a foundation allowing Defendant to plead other affirmative defenses that have been properly pled, this affirmative defense fails to raise a factual or legal challenge to Plaintiffs' claims." *Id.*

The Court agrees.

"Rule 8(c) requires a party to 'affirmatively state any avoidance or affirmative defense'

23

when responding to a pleading." *Odyssey Reinsurance Co. v. Cal-Regent Ins. Servs. Corp.*, 123 F. Supp. 3d 343, 356 (D. Conn. 2015). "[A] district court may still entertain [unpleaded] affirmative defenses at the summary judgment stage in the absence of undue prejudice to the plaintiff, bad faith or dilatory motive on the part of the defendant, futility, or undue delay of the proceedings." *Saks v. Franklin Covey Co.*, 316 F.3d 337, 350 (2d Cir. 2003). But here, Defendant has not responded to Plaintiffs' motion for summary judgment or elsewhere specifically pleaded any affirmative defenses possessed by the bonded principal, JL Marshall, for the Court to consider. Liberty Mutual therefore has waived any such defenses. *Oliphant v. Villano*, No. 09-cv-862 (SAS), 2014 WL 11462805, at *2 (D. Conn. Feb. 26, 2014) ("[F]ailure to plead an affirmative defense results in a waiver." (citing *Nat'l Market Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 526 (2d Cir. 2004))).

### 2. The Waiver of Claims by Failure to Provide Notice under the Project Labor Agreement, and Failure to Mitigate Damages Defenses

Liberty Mutual's second affirmative defense is that "Plaintiffs' claim is barred due to Plaintiffs failure to adhere to ARTICLE X. WAGES AND BENEFITS, SECTION 3. TRUST FUND DELINQUENCIES of the Project Labor Agreement." Answer at 3.

Liberty Mutual's third affirmative defense is that "Plaintiffs materially breached the terms of the [Project Labor Agreement] and as such are barred from bringing claims against Defendant." *Id.*

Liberty Mutual's sixth affirmative defense is that "Plaintiffs' claim is barred because they expressly and impliedly waived their rights to any alleged deficiencies in payments to benefits funds managed by the Trustees." *Id.* at 4. It contends that "Plaintiffs had the opportunity to collect any allegedly deficient payments owed by JFC [Construction] through joint checks issued by JL Marshall," but because "Plaintiffs refused this option and expressly directed [JL Marshall]

24

to continue to pay JFC [Construction]" and "disregarded the procedure for resolution of delinquent payments set forth in the Project Labor Agreement," they impliedly and expressly waived their right to bring a claim under the Payment Bond. Def's. Resp. to Interrogs. and Reqs. at 4.

Liberty Mutual's eighth affirmative defense is that Plaintiffs' claim is barred because they failed to mitigate their own damages. Answer at 4. Liberty Mutual contends that "Plaintiffs had an obligation, pursuant to the Project Labor Agreement[,] to apply payments from the [UConn] Project to delinquencies arising from a contractor's work on the Project," but again contends that Plaintiffs "either refused to collect any or misapplied payments tied to the [UConn] Project from JFC [Construction] to debts accrued by JFC [Construction] on other projects," and that Plaintiffs "failed to provide notice of alleged delinquencies despite knowledge of those delinquencies." Def's. Resp. to Interrogs. and Reqs. at 4.

Plaintiffs argue that these arguments are "unfounded and contrary to the plain language of the document." Pl.'s Mem. at 13. In their view, "it is clear from the plain language of the [Project Labor Agreement] that it is not intended to waive any external rights to recovery of delinquent benefit fund contributions. The [Project Labor Agreement] expressly preserves any external rights to recovery such as the [Payment Bond]." *Id.* Plaintiff argues with respect to the sixth affirmative defense that "neither the application of payments received on behalf of JFC [Construction] nor the October 2015 correspondence regarding the joint check operate as an express or implied waiver." Pl.'s Mem. at 19.

The Court agrees.

Article X, Section 3 of the Project Labor Agreement, titled "Trust Fund Delinquencies," provides that:

> [s]hould any Contractor become delinquent in the payment of fringe benefits as required by this Agreement, by no later than 60 days after the fringe benefit payment becomes delinquent an authorized representative of the involved Union shall notify the [Construction Manager] in writing via certified mail or email of such delinquencies. . . .

Project Labor Agreement, ECF No. 25-5 at 31–32. The Project Labor Agreement then is incorporated into the Payment Bond "by reference in its entirety." Payment Bond.

But the notice described in the Project Labor Agreement is not required before the claimant brings a lawsuit under the Payment Bond. In fact, Article X, Section 3 of the Project Labor Agreement states that "[t]his Section is not intended to create, enhance or diminish any rights in favor of any Contractor or any Benefit Fund against the CM for unpaid contributions to any Fund." Project Labor Agreement, ECF No. 25-5 at 32. While courts often enforce notice requirements where payment bonds explicitly require such notice, *see, e.g.*, *Elm Haven Const.*, 281 F. Supp. 2d at 413 (finding that claimant's failure to provide sufficient notice of a contractor's default on payments precluded them from "invok[ing] the surety's obligations," where the Payment Bond required that the principal "be declared by Obligee to be in default under the subcontract"), the Payment Bond here contains no such requirement. As a result, notice to Liberty Mutual of a subcontractor's alleged default is not required for a proper claimant to bring a claim under the Payment Bond. *See id.* at 412 ("[T]he liability of sureties is to be determined by the specified conditions of the bond.").

Defendant's second, third, sixth, and eighth affirmative defenses, asserting that Plaintiffs waived their right to bring a claim under the Payment Bond for unpaid contributions to the Funds and thereby failed to mitigate their own damages, are therefore unavailing.

26

### 3.   The Plaintiffs Received Full Payment for any and all Benefits Defense

Liberty Mutual's fourth defense is that "Plaintiffs' claim is barred because Plaintiffs received full payment for any and all benefits due from work performed on [the UConn Project]." Answer at 4.

Plaintiffs argue that Liberty Mutual has presented no evidence that Plaintiffs received full payment for benefits due and therefore that "Defendant has failed to meet the burden required to establish a genuine dispute as to a material fact with regards to Defendant's unsupported claim." Pls.' Mem. at 21.

The Court agrees.

"It is well-established that the party asserting an affirmative defense bears the burden of establishing that affirmative defense and its applicability by a preponderance of the evidence." *Munn v. Hotchkiss Sch.*, 24 F. Supp. 3d 155, 186 (D. Conn. 2014), *aff'd*, 724 F. App'x 25 (2d Cir. 2018). Moreover, "[a] party opposing summary judgment does not show the existence of a genuine issue of fact to be tried merely by making assertions that are conclusory or based on speculation." *Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008).

Liberty Mutual, having declined to oppose Plaintiffs' motion for summary judgment, has not shown that Plaintiffs received full payment to the Funds.

Indeed, the record evidence suggests that Plaintiffs did not receive all the funds they were due. Unpaid remittance reports that JFC Construction sent to the Iron Workers' Locals' Funds indicate that it owed weekly contributions to the Funds for weeks ending between November 21, 2015, and July 23, 2016. Unpaid Remittance Reports—UConn Project. JFC Construction paid three of these remittance reports. *See* Paid Remittance Reports—All Projects, ECF No. 25-8 at

140, 146, 149. The unpaid remittance reports add up to $407,441.64 in unpaid contributions to the Funds. *See* Unpaid Remittance Reports, ECF No. 25-7 at 2 (summarizing remittance reports for the UConn Project).

Beginning in February of 2016, JFC Construction began paying contributions that it owed to the Iron Workers' Locals' Funds for multiple projects, including the UConn Project, by check. Henderson Aff. ¶¶ 9–10. JFC Construction paid some checks jointly with the General Contractor for various projects; and it paid other checks directly to the Funds. *see* JFC Checks. The checks do not specify for which project they were intended. *See id.*

As stated by Ms. Henderson, "[a]ll joint check and direct payments were conditioned on the payments being applied to the projects for which JFC [Construction] performed work under the respective General Contractor," and the Funds therefore applied to all joint or direct checks to projects for which JFC Construction's work was performed for the respective contractor, Henderson ¶ 10. Of the thirty-one checks in the record, three were issued by O&G; thirteen were issued by CH Nickerson; and fifteen were issued directly by JFC Construction. *See* JFC Checks, ECF No. 25-9 at 1 (summarizing checks). Of the fifteen issued directly by JFC Construction, which totaled $146,809.17, it is unclear what general contractor's work is associated with those checks. *See* JFC Checks.

As a result, there is a genuine issue of fact as to which, if any, of these checks were intended for projects on which JL Marshall was general contractor, so as to permit Plaintiffs to apply those checks to the UConn Project. Conceivably, none of the direct checks from JFC Construction may be associated with projects for which JL Marshall was general contractor; or all of those checks may be associated with JL Marshall projects. In any event, Plaintiffs did

apply $22,937.92 of the $146,809.17 that JFC Construction paid to the UConn Project. Henderson Aff. ¶ 11.

In a discovery response, Defendant claims that "Plaintiffs applied payments received from JFC [Construction] for labor supplied to the [UConn] Project to other JFC debts owed to the Plaintiffs." Def's. Resp. to Interrogs. and Reqs. at 3. But Defendant does not state how many checks or in what amount were intended for the UConn Project, and there is no evidence in the record to substantiate this assertion.

With respect to the affirmative defense that Plaintiffs received full payment, however, the genuine issue of fact regarding which projects the checks were intended for is not material. The evidence shows that a maximum of $146,809.17 could have been applied to JL Marshall projects, since all other checks were issued jointly by different contractors—Nickerson and O&G—that were not involved in the UConn Project. *See* Henderson Aff. ¶¶ 9–10; JFC Checks. Even if Plaintiffs could have applied the full $146,809.17 to payments owed by JFC Contractors, this amount falls significantly short of the $407,441.64 allegedly owed to Plaintiffs, as indicated by the unpaid remittance reports. And there is no evidence in the record of any other payments to Plaintiffs that could have covered the entire amount owed.

Liberty Mutual states that JL Marshall had been "prepared to make payment to Plaintiffs through joint checks," but after receiving a letter Plaintiffs' counsel on October 26, 2015, "directing [JL Marshall] to continue to make contractual payments to JFC instead of to Plaintiffs through the use of joint checks," JL Marshall indeed "made all required contractual payments to JFC [Construction]," and "did not receive any communication regarding delinquencies from the Trustees for the remainder of JFC [Construction]'s time on the [UConn] Project." Def's. Resp. to Interrogs. and Reqs. at 3. But, again, to the extent there may be an issue of fact as to whether JL

Marshall made all required payments to JFC Construction, it is immaterial to whether those payments were ever made to Plaintiffs in full.

Without evidence that full payments were made on the remaining remittance reports, which it was Defendant's burden to present, Liberty Mutual has not met its burden to prove its affirmative defense that Plaintiffs received full payment.

### 4.   The Unclean Hands Doctrine Defense

Liberty Mutual's fifth defense is that Plaintiffs' claim is barred due to the doctrine of unclean hands. Answer at 4.

Plaintiffs argue that the doctrine of unclean hands only precludes equitable relief, and therefore does not preclude Plaintiffs' claims of damages under a bond. Pls.' Mem. at 16. They argue further that the doctrine of unclean hands requires a showing of "willful misconduct," which, they argue, Defendant cannot show. *Id.* at 17.

The Court agrees.

"The clean hands doctrine, also referred to as the doctrine of unclean hands . . . derives from 'the equitable maxim that he who comes into equity must come with clean hands.'" *Thompson v. Orcutt*, 257 Conn. 301, 302 n.1 (2001) (quoting *DeCecco v. Beach*, 174 Conn. 29, 34 (1977)). "In essence, 'where a plaintiff seeks equitable relief, he must show that his conduct has been fair, equitable and honest as to the particular controversy in issue.'" *Petroleum & Franchise Capital LLC v. Tejany Petroleum Naperville LLC*, No. 3:15-cv-00156 (JCH), 2016 WL 4099026, at *6 (D. Conn. Aug. 2, 2016) (quoting *Thompson*, 257 Conn. at 310)).

As a threshold matter, "the doctrine of unclean hands precludes only equitable relief." *Drummond American LLC v. Share Corp.*, No. 3:08-cv-1665 (MRK), 2009 WL 3838800, at *4 (D. Conn. Nov. 12, 2009) (citing *Bauer v. Waste Mgmt of Conn., Inc.*, 239 Conn. 515, 525

(1996)). Because Plaintiffs only seek damages, not equitable relief, the doctrine of unclean hands is inapplicable.

Moreover, "[u]nless the [party]'s conduct is of such a character as to be condemned and pronounced wrongful by honest and fair-minded people, the doctrine of unclean hands does not apply." *Bauer.*, 239 Conn. at 525. Thus, "the doctrine of unclean hands requires a showing of 'wil[l]ful misconduct.'" *Petroleum & Franchise Capital LLC*, 2016 WL 4099026, at *7. The Connecticut Supreme Court has defined "willful misconduct" as "intentional conduct designed to injure for which there is no just cause or excuse." *Dubay v. Irish*, 207 Conn. 518, 533 (1988)). "Not only the action producing the injury but the resulting injury also must be intentional." *Id.*; *see also TD Banknorth N.A. v. Genesis Props., LLC*, No. CV-085004597-S, 2009 WL 323616 at *1–2 (Conn. Super. Ct. Jan. 15, 2009) (using the aforementioned definition of "wil[l]ful misconduct" in the context of assessing an unclean hands defense and noting that "[t]he failure to allege intentional conduct with the design to harm renders the special defense [of unclean hands] subject to a motion to strike").

Liberty Mutual contends that the doctrine of unclean hands applies on the grounds that "Plaintiffs applied payments received from JFC [Construction] for labor supplied to the [UConn] Project to other JFC debts owed to the Plaintiffs," and that JL Marshall, "to its own detriment, relied on the Trustees['] direction to make payments directly to [JL Marshall]." Def's. Resp. to Interrogs. and Reqs. at 3.

But, as explained above, Liberty Mutual has not presented any evidence substantiating this assertion. Even if it had, they have not set forth any evidence suggesting that such alleged misapplication of funds was conducted intentionally with the intent to harm, and the Court cannot identify any.

31

The doctrine of unclean hands therefore is inapplicable, both because Plaintiffs seek only damages and because there is no evidence in the record suggesting that any alleged misapplication of funds was intentional and with the intent to harm.

**5.   The Laches Defense**

Liberty Mutual's seventh affirmative defense is that "Plaintiffs' claim is barred by the doctrine of laches." Answer at 4.

Plaintiffs argue that the doctrine of laches only precludes equitable relief, and therefore does not preclude Plaintiffs' claims of damages under a bond. Pls.' Mem. at 23. They argue further that the doctrine of laches requires a showing of "willful misconduct," which, they argue, Defendant cannot show. *Id.* at 17.

The Court agrees.

Laches is an equitable defense to claims seeking equitable relief. *See Zuckerman v. Metro. Museum of Art*, 928 F.3d 186, 190 (2d Cir. 2019) ("Laches is an equitable defense available to a defendant who can show 'that the plaintiff has inexcusably slept on [its] rights so as to make a decree against the defendant unfair,' and that the defendant 'has been prejudiced by the plaintiff's unreasonable delay in bringing the action.'" (quoting *Merrill Lynch Inv. Mgrs. v. Optibase Ltd.*, 337 F.3d 125, 132 (2d Cir. 2003))); *Ikelionwu v. United States*, 150 F.3d 233 (2d Cir. 1998) ("[Laches] is an equitable defense that 'bars a plaintiff's equitable claim where he is guilty of unreasonable and inexcusable delay that has resulted in prejudice to the defendant.'" (quoting *Ivani Contracting Corp. v. City of N.Y.*, 103 F.3d 257, 259 (2d Cir. 1997)).

To show that the doctrine of laches bars equitable relief in a particular case, "there must have been a delay that was inexcusable, and . . . that delay must have prejudiced the opposing party." *Treglia v. Zanesky*, 67 Conn. App. 447, 459 (2001) (internal quotation marks and

alterations omitted), *cert. denied*, 259 Conn. 926 (2002). The doctrine "functions in part as a kind of 'flexible' statute of limitations, barring long-delayed claims where no statute of limitations was available for that purpose." *Fromm v. Fromm*, 108 Conn. App. 376, 385 (2008) (internal citations and quotation marks omitted). "The mere lapse of time does not constitute laches unless it results in prejudice to the opposing party as where, for example, the opposing party is led to change his position with respect to the matter in question." *Id.* at 385–86 (quoting *Emerick v. Emerick*, 28 Conn. App. 794 (1992)) (internal quotation marks and alterations omitted).

As a threshold matter, because Plaintiffs only seek damages, not equitable relief, the doctrine of laches is inapplicable here. But even if Plaintiffs sought equitable relief, Defendant has not shown that any inexcusable delay or prejudice to them in Plaintiffs' bringing a claim under the Payment Bond. *See Cummings v. Tripp*, 204 Conn. 67, 88 (1987) ("The burden is on the party alleging laches to establish that defense."

The doctrine of laches therefore is inapplicable, both because Plaintiffs seek only damages and because there is no evidence in the record suggesting that any alleged delay in Plaintiffs bringing this claim was inexusable or prejudiced Defendant.

### 6.  The Unjust Enrichment Defense

Liberty Mutual's ninth affirmative defense is that Plaintiffs' claim is barred because recovery from Defendant would result in their unjust enrichment. Answer at 4.

Plaintiffs argue that the theory of unjust enrichment is inapplicable here

The Court agrees.

Unjust enrichment is "a broad and flexible remedy," "[w]ith no other test than what, under a given set of circumstances, is just or unjust, equitable or inequitable, conscionable or unconscionable." *Vertex, Inc. v. City of Waterbury*, 278 Conn. 557, 573 (2006). In order to

recover for unjust enrichment, a plaintiff "must prove (1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment." *Id.*

Connecticut caselaw is not definitive as to whether unjust enrichment may be asserted as an affirmative defense. As a recent Connecticut court decision noted, "[The Connecticut] Supreme Court has not actually been called upon to address the issue of whether unjust enrichment is appropriately pleaded as a special defense . . . , however . . . [d]ecisions of the superior court have addressed this precise issue . . . and have determined that the special defense of unjust enrichment is without merit because unjust enrichment is a cause of action which permits a recovery; it is not a defense [that] precludes recovery by another party." *Rozbicki v. Lichaj*, No. CV-176015346-S, 2019 WL 624582, at *8 (Conn. Super. Ct. Jan. 18, 2019) (internal citation, quotation marks, and alterations omitted).

Even if unjust enrichment is a permissible affirmative defense, it is not appropriate in this case.

A "right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another." *Davis v. Conn. Cmty. Bank*, N.A., 937 F. Supp. 2d 217, 243 (D. Conn. 2013) (quoting *Gagne v. Vaccaro*, 255 Conn. 390, 408 (2001) (internal quotation marks omitted)). In analyzing a claim of unjust enrichment, the Court must "examine the circumstances and the conduct of the parties" and determine "what, under a given set of circumstances, is just or unjust, equitable or inequitable, conscionable or unconscionable." *Id.* at 451 (internal citations and quotations omitted); *see also Greenwich Contracting Co., Inc. v. Bonwit Constr. Co., Inc.*, 156 Conn. 123, 130 (1968) ("[T]he word

34

'unjustly' as used in the equitable maxim that one shall not be allowed unjustly to enrich himself at another's expense means unlawfully.").

Nothing in the parties' filings or in the record suggests that Plaintiffs are seeking to enrich themselves unfairly at Defendant's expense. Indeed, as the Court has explained, the record shows that Plaintiff Funds were not paid for the benefit fund contributions it now seeks. Thus, Defendant's unjust enrichment defense is unavailing.

### 7.  Failure to Join Necessary Parties Defense

Liberty Mutual's tenth affirmative defense is that Plaintiffs failed to name and join necessary parties. Answer at 4.

Plaintiffs argue that they were not required to join any additional party under Rule 19(a) of the Federal Rules of Civil Procedure. Pls.' Mem. at 21–22.

The Court agrees.

Under Rule 19(a), a person is required to be joined in an action if:

> (A)   "in that person's absence, the court cannot accord complete relief among existing parties; or
>
> (B)   that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
>
>> i.   as a practical matter impair or impede the person's ability to protect the interest; or
>> ii.  leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1)(A)–(B).

None of those circumstances are present here. Under the terms of the Payment Bond, any claimant is permitted to bring a claim, without any requirement that other claimants be joined in the action. *See* Payment Bond. The Court therefore can accord relief to proper claimants under

the Payment Bond without joinder of additional parties. *See Alston v. Chapdelaine*, No. 3:15-cv-434 (CSH), 2016 WL 543105, at *2 (D. Conn. Feb. 10, 2016) ("There has been no assertion that in their absence, 'the court cannot accord complete relief among existing parties' or that they claim 'an interest relating to the subject of the action' so that 'disposing of the action' in their absence would 'impair or impede [their] ability to protect the interest' or leave an existing party at 'substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.'").

Thus, Defendant's tenth affirmative defense is unavailing.

### 8. Defenses regarding whether any damage suffered by Plaintiffs is the result of others; Whether Defendants' actions are lawful; Privity of Contract

Liberty Mutual's eleventh affirmative defense is that "[a]ny damage . . . suffered by Plaintiffs is not the result of any action by Defendant . . . ." Answer at 4. Its twelfth affirmative defense is that "all actions by Defendant as they concern this matter were lawful." *Id.* at 5. Its thirteenth affirmative defense is that "Plaintiffs are not in privity of contract with Defendant." *Id.*

Plaintiffs argue that none of these defenses are elements of Plaintiffs' claims under the Payment Bond and therefore are "legally insufficient to contest Defendant's liability under Plaintiffs claims." Pls.' Mem. at 22.

The Court agrees.

As the Court has stated, the Payment Bond permits any proper claimant "who has not been paid in full before the expiration of ninety (90) days after the date on which the last of such claimant's work or labor was done or performed" to sue on the bond. The Payment Bond does not require that claimants show that their actions did not contribute to the damage they suffered, or that claimants be in privity with the Surety. *See Elm Haven Const.*, 281 F. Supp. 3d at 412 ("[T]he liability of sureties is to be determined by the specified conditions of the bond.");

36

*Oldcastle Precast, Inc.*, 2007 WL 2904208, at *3 ("Unistress' argument that none of its sub-subcontractors could sue Klewin because none had a contract with Klewin is equally unavailing. Unistress cites no authority for the proposition that, without privity, the sub-subcontractors would have no ground under which to sue Klewin."). It also is immaterial under the Payment Bond whether Defendant's actions were lawful or not. The "general purpose of a suretyship contract is to guard against loss in the event of the principal debtor's default," and the "obligation of a surety is an additional assurance to the one entitled to the performance of an act that the act will be performed." *Elm Haven Const.*, 281 F. Supp. 2d at 412. The lawfulness of a Surety's actions is irrelevant whether a claimant is entitled to relief under a Payment Bond

Thus, Defendant's eleventh, twelfth, and thirteen affirmative defenses are unavailing.

### 9. Failure to Adhere to Requirements of the Bond, and Statute of Limitations Defenses

Liberty Mutual's fourteenth affirmative defense is that Plaintiffs' claim is barred because it failed to adhere to the requirements of the" Payment Bond. Answer at 5. Specifically, Defendant argues that "Plaintiff failed to commence this action within the time period required by the" Payment Bond. Def's. Resp. to Interrogs. and Reqs. at 5. Similarly, Liberty Mutual's sixteenth affirmative defense is that Plaintiffs' claim is barred by the applicable statute of limitations. Answer at 5.

As the Court has already explained, however, the one-year limitation on claims brought under the Payment Bond is unenforceable under Conn. Gen. Stat. § 38a-290, which provides that "[n]o insurance company doing business in this state shall limit the time within which any suit shall be brought against it . . . on (1) a fidelity or surety bond to a period less than three years from the time when the loss insured against occurs," or "(2) a construction performance bond to

a period less than three years from the date on which the principal last performed work under the contract[.]"

Thus, Defendant's fourteenth and sixteenth affirmative defenses are unavailing.

### 10. The Doctrine of Accord and Satisfaction Defense

Liberty Mutual's fifteenth affirmative defense is that Plaintffs' claim is barred by the doctrine of accord and satisfaction. Answer at 5.

Plaintiffs argue that because "Defendant has provided no evidence of a prior agreement between the Parties or between the Plaintiffs and J.L. Marshall[,] Defendant has [ ] failed to raise a dispute as to a material fact with regards to the existence of such an agreement." Pls.' Mem. at 22.

The Court agrees.

"'Accord and satisfaction' is a method of discharging a claim whereby the parties agree to give and accept something other than that which is due in settlement of the claim and to perform the agreement." *Oneto v. Town of Hamden*, 169 F. Supp. 2d 72, 78 (D. Conn. 2001) (quoting *B & B Bail Bonds Agency of Conn. v. Bailey*, 256 Conn. 209, 213 (2001)).

Thus, the doctrine of accord and satisfaction arises only when there is an agreement between the parties to discharge the claim under the Payment Bond. There is no evidence of any such agreement which might invoke the doctrine of accord and satisfaction here.

Thus, Defendant's fifteenth defense is unavailing.

### 11. The Failure to State a Claim Defense

Liberty Mutual's seventeenth affirmative defense is that Plaintiffs have failed to state a claim. Answer at 5.

The Court has already addressed whether Plaintiffs state a claim, and has found that a genuine issue of material fact exists as to whether there was a direct written contract between Iron Workers' Locals No. 15 and 424 and JFC Construction, or JL Marshall, which would permit Plaintiffs to sue as claimants on the Payment Bond.

**12. Limit on Defendant's Liability Defense**

Liberty Mutual's eighteenth affirmative defense is, "[t]o the extent Defendant has any liability, if any, it is limited to the penal sum of the bond at issue in this case." Answer at 5.

Plaintiffs argue that their "claims are not in excess of this penal sum, and as such, it is inapplicable to Plaintiffs' claims in this case."

The Court agrees.

Under the terms of the Payment Bond, "J.L. Marshall [ ], as Principal, and Liberty Mutual [ ], as Surety, are bound unto Skanska [ ], as Obligee, in the penal sum of [$9,770,445]," for work on the UConn Project. Payment Bond.

Plaintiffs here seek only $409,879.58, plus interest and reasonable attorneys' fees and costs. *See* Compl. at 4. This amount is well short of the penal sum in the Payment Bond.

Thus, Defendant's eighteenth defense is unavailing.

**IV.    CONCLUSION**

For the foregoing reasons, Plaintiffs' motion for summary judgment is **DENIED** without prejudice to renewal by **October 2, 2020**, to the extent Plaintiffs can provide sufficient documentary evidence of the existence of a direct written contract between Iron Workers' Locals No. 15 and 424 and J.L. Marshall & Sons, Inc., or J.F.C. Construction, LLC, for the labor performed on the relevant building project in 2015–2016, consistent with this opinion. If

Plaintiffs fail to renew this motion by **October 2, 2020**, or seek leave for an extension of this deadline, the case will be scheduled for trial.

As discussed above, based on Plaintiffs' filings and Liberty Mutual's failure to respond to them, there is no other genuine issue of material fact to be tried, and all of Liberty Mutual's affirmative defenses fail as a matter of law, save one, which fails for lack of record evidence

Accordingly, consistent with this Court's "inherent authority to manage [its] docket[ ] and courtroom[ ] with a view toward the efficient and expedient resolution of cases," *Dietz*, 136 S.Ct. at 1892, rather than simply deny this motion, the Court considers it more "efficient and expedient" to give Plaintiffs an opportunity to re-file it, if sufficient documentary evidence can be provided, consistent with this opinion.

**SO ORDERED** at Bridgeport, Connecticut, this 21st day of August, 2020.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE